FILED

2010 Oct-05  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# JASPER DIVISION

TAMMIE WALLACE,               )
                             )
     Plaintiff,         )
                             )
v.                            )          Case No. 6:09-CV-0290-JEO
                             )
BAKER BEAUTY, INC., et. al.,  )
                             )
                             )
     Defendants.        )

_____

BETHANY HONEY,                )
                             )
     Plaintiff,         )
                             )
v.                            )          Case No. 6:09-CV-0320-JEO
                             )
BAKER BEAUTY, INC., et al.,   )
                             )
     Defendants.        )

## <u>MEMORANDUM OPINION</u>

This case is before the court on the defendants' motions for summary judgment (doc. 23,

25) on claims alleged in the plaintiffs' (Tammie Wallace[1] and Bethany Honey[2]) complaints.[3]

---

[1]The defendants move for summary judgment on counts I (sexual harassment - hostile work environment), II (negligent/wanton hiring, training, supervision, and retention), and III (intentional infliction of emotional distress) of Wallace's amended complaint (6:09-cv-00290-JEO at doc. 13). The defendant does not move for summary judgment on count IV (battery).

[2]The defendants move for summary judgment on counts I (sexual harassment - hostile work environment), II (negligent/wanton hiring, training, supervision, and retention), and III (intentional infliction of emotional distress) of Honey's amended complaint (6:09-cv-00320-JEO at doc. 10). The defendants do not move for summary judgment on count IV (assault and battery).

[3]This case started out as two separate actions: *Tammie Wallace v. State Beauty Supply, Baker Beauty, Inc., and Daniel Baker*, 6:09-JEO-0290-J and *Bethany Honey v. State Beauty Supply, Baker Beauty, Inc., and Daniel Baker*, 6:09-PWG-0320-J. Because the two separate complaints named the same defendants and sought largely the same or similar relief, the court consolidated the cases into one action in the interest of judicial economy in accordance with FED. R. CIV. P. 42. (Doc. 19). Prior to the court's order of consolidation, each plaintiff voluntarily dismissed her claims against State Beauty Supply, leaving Baker Beauty Supply, Inc., and Daniel E. Baker as defendants.

Because the defendants' motions are virtually identical with only slight factual differences, the court will address both motions herein.   For the reasons set forth below, the court finds that the defendants' motions are due to be granted.

**BACKGROUND**

Baker Beauty, Inc., d/b/a State Beauty Supply, is a professional salon distributor that specializes in the business of outfitting professional beauty salons, barber shops, and nail salons with merchandise.  (Baker Dep. at 16, 20).[4]  Daniel Baker has operated Baker Beauty in Decatur, Alabama, with his former wife Judith Baker, since October 2003.  (Baker Dep. at 19).

Tammie Wallace's Employment With Baker Beauty

Wallace went to work for Baker Beauty as a Sales Representative in March 2007. (Wallace Dep. at 17).[5]  Her sales territory included Decatur, Moulton, and Winston County, including parts of Haleyville and Double Springs.  (Wallace Dep. at 24).  Wallace spent about 40-50% of her working hours around Baker.  (Wallace Dep. at 25).  The plaintiff came into the store for sales meetings and to pick up orders and merchandise and drop off orders and payments. (Baker Dep. at 39-42).  Otherwise, the plaintiff's time was spent outside of the store servicing the salons within her territory.  (Baker Dep. at 39-41).

Bethany Honey's Employment With Baker Beauty

Honey went to work for Baker Beauty as a Sales Representative in August 2005.  (Baker

---

[4]Daniel Baker's deposition is located at doc. 22-2 and 24-2 in the court's electronic record of the case.  The defendants offered an evidentiary submission in support of each of their motions.  Those submissions are located at documents 22 and 24 of the court's record.  Those submissions are identical in their entirety.

[5]Wallace's deposition is located at doc. 22-9 and 24-9 in the court's electronic record of the case.

Dep. at 37; Honey Dep. at 9-10).[6]  Her sales territory included Athens, Haleyville, and Jasper,

Alabama, and parts of Walker, Limestone, and Lawrence counties.  (Baker Dep. at 38).   The

plaintiff spent about 50-70% of her time at work around Baker.  (Honey Dep. at. 16-17, 25-28).

On Mondays, Honey spent the day in the Decatur store.  On Tuesdays, Honey spent most of the

morning in the Decatur store picking up beauty supplies to deliver to customers, and Honey was

also around Baker when he traveled to one of her territories and worked out of the Jasper store.

(Honey Dep. at 16-17, 25-28).

        The Tulsa, Oklahoma Semi-Annual Sales Meeting

        In August 2007, Baker and the plaintiffs traveled to Tulsa, Oklahoma for a sales

convention along with other Baker Beauty employees, including Keith Sanford, Sherry

Hawthorn, Mary Ward, Kathy Sims, and Heather Harris.  (Baker Dep. at 78-84).  On the first day

of the meeting, Baker attended approximately two hours of meetings, and spent some time

viewing booths on display.  During that time, Baker drank about four or five beers.  (Baker Dep.

at 91-96).  Honey and Wallace were arriving at the hotel around that same time that Baker was

returning from the convention.  When he saw them, he told them that he was having a meeting in

his room and said, "y'all can be there or you don't have to be there.  I really don't give a shit."

(Honey Dep. at 53-54).  Baker, Keith Sanford, Sherry Hawthorn, Mary Ward, Kathy Sims, and

Heather Harris gathered in Baker's hotel room that he was sharing with Keith Sanford to discuss

the day's events.  (Baker Dep. at 94-95).  The plaintiffs later joined the rest of the group in

Baker's room.  (Baker Dep. at 95; Honey Dep. at 54; Wallace Dep. at 38).

        While in the hotel room, Baker and Sanford continued to drink beer and "White

_____

        [6]Honey's deposition is located at 22-3 and 24-3 in the court's electronic record of the case.

3

Russians."[7]  (Baker Dep. at 100; Sanford Dep. at 27).  Over the course of the evening, Baker and

Sanford both became intoxicated.[8]  (Baker Dep. at 103; Sanford Dep. at 22-23).

When the plaintiffs arrived in the room, all of the sales reps were seated and Baker was

standing up, discussing some of the things they had seen at the meeting that day.  (Honey Dep. at

56).  He was saying, "We are going to take these fucking bills and we are going to take them to

these fucking salons, and we are going to put them in our fucking car, and we are going to sale

the fuck out of them."  Baker then looked at Wallace and stated, "and you can get on the boat or

get off the boat.  I really don't give a shit."  (Honey Dep. at 56-57; Wallace Dep. at 41).

Baker then looked at Sanford and said, "Keith, Keith, tell them why you're such a good

sales rep.  Tell these girls why you are such a good sales rep.  It's because you've got a big

dick."[9]  (Honey Dep. at 57-58).  Wallace then recalls Baker telling a joke about a woman and her

"pussy," and looking to the female sales reps, and saying, "and I'll tell you how I make my

money off all ya'll, I pimp out all my hoes [sic]."   (Honey Dep. at 58; Wallace Dep. at 42).

Honey recalls Heather Harris being visibly upset by Baker's comments, and Sherry and Mary

making their way to the door to leave, as Baker continued to tell a joke about a woman's "pussy."

(Honey Dep. at 59).

At some point, everybody left the hotel room except Baker, Sanford, and Wallace.

(Honey Dep. at 60).  When Honey got back to the room that she was sharing with Wallace, she

---

[7]According to Sanford, a "White Russian" is made up of Kahlua, vodka, and Half & Half.  (Sanford Dep. at 27-28).

[8]Sanford testified that he was intoxicated before he left the convention center, and that he drank three or four screwdrivers and three or four beers before arriving in Tulsa, that they walked around the trade show with one or two beers in each hand, and that they did tequila shots and Washington apple shots in the hotel bar before going back to the room.  (Sanford Dep. at 25-26).

[9]Sanford testified that he does not recall Baker making the comment during the meeting, but does remember someone mentioning this later, although he is not sure who it was that mentioned it.  (Sanford Dep. at 32-34).

realized that she did not have a room key and headed back to Baker's room to get a key from

Wallace.  (Honey Dep. at 61).  As she approached the room, she heard Baker yelling, "Beth

[Honey] get in here.  Beth get in here now."  (Honey Dep. at 61).  She eased the door open and

asked Wallace for the room key, and Baker said, "Beth you get in now, get in her right now.  I've

got something I want to get off my chest.  Get in here and let's just lay it out on the table."  (*Id*.).

According to Honey, Baker was "crazy, just slapping the table and screaming."  (*Id*.).  Honey told

Baker that she did not want to talk to him right then because he was really upset and she didn't

think it was a good idea to try to talk to him.  Baker insisted that she sit down, and she did.

(Honey Dep. at 18, 64).  As to what happened after she sat down, Honey testified as follows:

> I sat down, and he said, "I think you want to leave me.  Are you going to
> leave me?"  And I said, "Danny, I don't know what you're talking about."  And he
> said, "I feel like you want to leave me.  You don't know what I know.  You don't
> know what I know."  And he was just beating his chest.
>
> And I said, "Danny, I don't know what you're talking about.  I don't
> know."  I said, "Is this coming from April?"  Because previous to this they had
> just fired April.  And he said, "No, this has to do with you and I think you're
> going to leave me, I think you're going to leave State Beauty Supply." ... And he
> said, "You don't know what I go through.  You don't know what I know.  And I
> know that you want to leave me.... What is your problem?  What is your problem?
>
>
> And I Said, "Danny, you know, I asked you to help me with a customer - -
> " and I'm staying calm the whole time because I know he's furious and he's
> getting irate.  And I said, "You know, I asked you to help me with issues with the
> work, and, you know, we have back orders that are crazy."  And I said, "You
> know, you call and make things worse with customers."
>
> And he said, "What are you talking about?  I want an example.  I want to
> know what you're talking about."  And I [gave him an example and said], "You
> know, she was upset because her order was wrong again."  These are - - we're
> commissioned.  We're paid on commissions and when these people are upset,
> that's our money.  An said, "You now I called you, being the owner of the store,
> thinking you could call and smooth it over with her and tell her we'll try to get her

order right next time.  And she called me and told me not to ever have you come in their salon again or call her because you were so ugly to her on the phone, talking down to her and calling her a liar."

And at that point he takes his binder and throws it up against the wall, and just papers go everywhere, knocks the coffee pot off the coffee maker.  And I was just thinking, "Oh, my gosh."

Well, Tammie was standing in there with me, and Tammie said, "Danny, calm down, just calm down.  You're getting loud, just calm down."  And he looked at Tammie and he said, "You don't know shit.  You're not shit.  You get out of my face."  And he was just right up in her face.

Well, he looks at me and says, "No one has ever made me this mad.  You bitch."  And he got in my face, up in my face, and said, "you don't know what I have to go through," just getting irate.  And he's holding the side of the table.

And I began to cry uncontrollably, because I was thinking, "Oh, my gosh, he's going to kill me."  And he grabbed the edge of the table, and he said - - he just was - -I don't remember at that point exactly what - - he was just ranting and raving.  I was just kind of out of my body thinking he was going to kill me.

Tammie had gone to get help.  I remember she went to get Keith first, to the bedroom that was off of the kitchen.  And she couldn't wake him up.  And she ran out of the hotel room and into the hall.  I could hear her screaming.  And Danny was just over me, and he was just spitting in my face.[10]  And I was wiping my face, sand he reared back to hit me.  And I was thinking, "Oh, my God, he's going to kill me and nobody is in here to help me."

Well, when Tammie ran out into the hall the door just slammed on the lock that was turned backwards.  And when he was drawing back like this and he heard that loud noise it was like he caught himself and he [got right in front of my face].  He said, "Get out of my face you fucking piss ant."  And he knocked something - - I don't remember what he knocked over at that point, but he had turned and knocked something over, and that's when I ran out into the hall.  And I just hit my knees because I thought, "Oh, my God, I cannot believe that he has just done this."

And by that time, Tammie had gotten Heather and Kathy and they were coming down the hall.  And we got into the elevator and we got up to the room.  And we were just sobbing uncontrollably like we could not believe this actually

---

[10]Wallace also testified that Baker spit in her face.  (Wallace Dep. at 40).

happened.

(Honey Dep. at 61-67).

The next morning, Honey and Wallace got up and went across the street to the convention center, and asked to speak to Rex Blair, who they understood to be the President of State Beauty Supply. Mr. Blair was not available, but the plaintiffs met with Susan Massey (Vice President) and Richard Wood (Store Development Manager) and told them what happened the night before. (Honey Dep. at 70-71). After the meeting, Massey and Wood assured the plaintiffs that action would be taken, and that Mr. Blair would know about the incident. (Honey Dep. at 74).

Baker also met with Massey and Wood about the incident. (Baker Dep. at 111-112). They asked him if he'd had any sexual contact with either plaintiff, and he responded that he had absolutely not had any physical contact with either woman. (Baker Dep. at 112). Baker later met with the rest of his staff and apologized to them for his actions. (Baker Dep. at 113, 129).

At some point, Baker called his wife and left her a message that he had "just pissed off Beth and Tammie," and that he thought they would sue them. (Judith Baker Dep. at 31).[11] Ms. Baker left messages on the plaintiffs' voicemails apologizing for her husband and saying that she was very embarrassed by his actions. (Honey Dep. at 88-89). The plaintiffs left Tulsa on August 17, 2007, and never returned to work. (Honey Dep. at 12).

<u>Other Complained Of Conduct</u>

Wallace testified that Baker commented on other females' appearances. On one occasion, Baker commented that a stylist "had a nice ass." (Wallace Dep. at 22). On another occasion, Baker and a male stylist had a conversation in front of Wallace about being with a

---

[11]Judith Baker's deposition is located at document 22-8 in the court's electronic record of the case.

particular woman and the types of things he would do.  (Wallace Dep. at 22-23).  Wallace also complained that Baker used profanity in the workplace, such as "fuck," "bitch," "motherfucker," and "GD."  (Wallace Dep. at 26-27).  Wallace also complained that Baker once referred to her as a "stupid bitch" during a sales meetings.  (Wallace Dep. at 25-26).

Honey testified that Baker frequently complained about the condition of her car, and stated, "Your fucking car is just a wreck.  You need to get out there and fucking clean it up." (Honey Dep. at 36).  Honey also testified that she complained to Baker about his vulgarities and use of sexually explicit language on multiple occasions, and asked him to stop.  (Honey Dep. at 20-21).  Honey also complained that Baker: once used the phrase "jack each other off;"[12] made comments to one of Honey's customers about "looking sexy tonight with those ta-tas hanging out;" laid on a hotel bed in front of Honey and one of her customers, unzipped his pants, and said, "Now Kelly, you know if you ever get any fake boobs, you're going to have to let me see and feel them;" and frequently used words like "fuck" and "motherfucker."  (Honey Dep. at 37-43).

## DISCUSSION

### Summary Judgment Standard

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden

---

[12]Wallace was also present for this comment.  (Honey Dep. at 37).

to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof.   *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b).  Once the moving party has met her burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.  The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings.  (*Id*.).

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

**Hostile Work Environment/ Tangible Averse Employment
Action Sexual Harassment**

The plaintiffs assert hostile work environment claims premised on sexual harassment. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998). To establish a claim for a hostile or abusive working environment, an employee must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been
> subject to unwelcome sexual harassment...; (3) that the harassment must have
> been based on the sex of the employee; (4) that the harassment was sufficiently
> severe or pervasive to alter the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) a basis for holding the
> employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001) (*citing Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)). In *Gupta*, the Eleventh Circuit stated:

> The fourth element ... is the element that tests the mettle of most sexual
> harassment claims. Requiring the plaintiff to prove that the harassment is severe
> or pervasive ensures that Title VII does not become a mere "general civility code."
> *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L.
> Ed. 2d 662 (1998).

*Gupta*, 212 F.3d at 583. Title VII may include a prohibition of sexual harassment, but it is clearly not a federal civility code. *Mendoza*, 195 F.3d at 1245.

"Title VII 'does not prohibit all verbal or physical harassment in the workplace,' and 'does not reach genuine but innocuous differences in the ways men and women routinely interact

10

with members of the same sex and of the opposite sex.'  Instead, Title VII prohibits only the type

of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's

employment.'"  *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509

(11th Cir. 2000) (*quoting Oncale*, 523 U.S. at 80-81).

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to

hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to
> alter an employee's terms or conditions of employment includes a subjective and
> an objective component....  The employee must subjectively perceive the
> harassment as sufficiently severe and pervasive to alter the terms or conditions of
> employment, and this subjective perception must be objectively reasonable.  The
> environment must be one that a reasonable person would find hostile or abusive
> and that the victim subjectively perceives to be abusive.  Furthermore, the
> objective severity of the harassment should be judged from the perspective of a
> reasonable person in the plaintiff's position, considering all the circumstances.
>
> The objective component of this analysis is somewhat fact intensive....
> The courts should examine the conduct in context, not as isolated acts, and
> determine under the totality of the circumstances whether the harassing conduct is
> sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's
> employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted).  The Supreme Court in

*Faragher* stated, "We have made it clear that conduct must be extreme to amount to a change in

the terms and conditions of employment ...."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788,

118 S. Ct. 2275, 2284, 141 L. Ed. 2d 662 (1998) (*citing Carrero v. New York City Housing

Auth.*, 890 F.2d 569, 577-78 (2nd Cir. 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-50

(8th Cir. 1986).

The plaintiffs allege that the facts are sufficient to meet the burden described in *Faragher*

and *Gupta*.  In their motions, the defendants assert that the plaintiffs' claims are due to be

11

dismissed for two distinct reasons: (1) the conduct in question was not based on gender; and (2) the conduct was neither severe nor pervasive enough to alter the plaintiffs terms and conditions of employment and create an abusive working environment.  (Doc. 25 at 22-29).

### a.  Not Based on Gender

Without any supporting argument, the defendants assert that, "[a]s an initial matter, the Defendants dispute that the alleged harassment was based upon the sex of the employee."  (Doc. 25 at 25).  The court agrees that not all of Baker's conduct was based on sex.  Specifically, the court finds that the "Tulsa incident" and Baker's use of the words "fuck," "motherfucker," and "God damn," were not based on gender.[13]  While "God damn" is obviously not gender-specific, "fuck" requires a closer look.  The Eleventh Circuit has reasoned that the word "fuck," is not necessarily gender-specific.  Instead, courts should look at the context in which the word is used to determine whether the word might contribute to a hostile work environment.

> ... the context may illuminate whether the use of an extremely vulgar, gender-neutral term such as "fucking" would contribute to a hostile work environment. "Fucking" can be used as an intensifying adjective before gender-specific epithets such as "bitch."  In that context, "fucking" is used to strengthen the attack on women, and is therefore relevant to te Title VII analysis.  However, the obscene word does not itself afford a gender-specific meaning.  Thus, when used in context without reference to gender, "fuck" and "fucking" fall more aptly under the rubric of general vulgarity that Title VII does not regulate."  *See Oncale v. Sun downer Offshore Servs.,Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998) (observing that harassment with sexual connotations is not by itself sexual harassment).

*Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810, n.4 (11th Cir. 2010).  The alleged instances of the word "fuck" and "motherfucker" in the instant case are without reference to

---

[13]While the "Tulsa incident" seems to be the crux of the plaintiffs' complaints, the court cannot find any evidence that Baker's vile behavior in Tulsa was based on gender at all.  Instead, the evidence shows that his conduct was based on his disgruntlement that Honey might be leaving his employ.

gender.  Specifically, the plaintiffs allege that Baker used the word "fuck" in the following ways:

- "We are going to take these fucking bills and we are going to take them to these fucking salons, and we are going to put them in our fucking car, and we are going to sale the fuck out of them."  Baker then looked at Wallace and stated, "and you can get on the boat or get off the boat.  I really don't give a shit."  (Honey Dep. at 56-57; Wallace Dep. at 41).

- "Get out of my face you fucking piss ant."  (Honey Dep. at 67).

- General use of "fuck" and "motherfucker" in the workplace.  (Wallace Dep. at 27)

- "Your fucking car is just a wreck.  You need to get out there and fucking clean it up."  (Honey Dep. at 36).

Because none of the alleged uses of the word "fuck" were gender-specific, the court finds that the plaintiffs' claims as to the use of the word "fuck" fall under the "rubric of general vulgarity that Title VII does not regulate."  The remaining alleged incidences, however, at least have a sexual component to them.  Therefore, at this juncture, the court finds that at least some of the alleged conduct was sufficiently based on gender to preclude summary judgment on that ground.

### b.  Not Severe and Pervasive

The crux of the defendants' argument is that the alleged harassment is not severe and pervasive enough to alter the terms and conditions of plaintiffs' employment.  (Doc. 25 at 19-29). "The courts should examine the conduct in context, not as isolated acts, and determine under the *totality of the circumstances* whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment."  *Mendoza*, 195 F.3d at 1246 (emphasis added).  The defendants assert that although the plaintiffs allege that Baker called them sexual expletives, clinched his fist in anger at Wallace, and spit in Wallace's face during the verbal confrontation, he did not touch or

hit either one of them.  (Doc. 23 at 23; Doc. 25 at 23).  However, the fact that Baker did not make

physical contact with either plaintiff (aside from his "spittle") is not conclusive of whether the

alleged harassment was severe or pervasive, as that assertion only relates to the "Tulsa

incident."[14]

A look at *Mendoza* and the litany of case examples discussed therein where courts have

found the conduct to be insufficient is appropriate at this juncture.  The *Mendoza* court cited the

following:

> Other circuits have applied these factors to delineate a minimum level of
> severity or pervasiveness necessary for harassing conduct to constitute
> discrimination in violation of Title VII.  Many decisions throughout the circuits
> have rejected sexual-harassment claims based on conduct that is as serious or
> more serious than the conduct at issue in this appeal.  *Shepherd v. Comptroller of
> Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that
> several incidents over a two-year period, including comment "your elbows are the
> same color as your nipples," another comment that plaintiff had big thighs,
> touching plaintiff's arm, and attempts to look down the plaintiff's dress, were
> insufficient to support hostile-environment claim); *Indest v. Freeman Decorating,
> Inc.*, 164 F.3d 258, 264-67 (5th Cir. 1999) (noting it was "dubious" whether
> several sexually oriented comments and gestures and an implied threat of
> retaliation for refusing a sexual advance would be sufficient to establish a hostile
> environment); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir.
> 1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus
> single incident of "deliberately" touching plaintiff's "breasts with some papers
> that he was holding in his hand" were insufficient to alter the terms or conditions
> of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357
> (7th Cir. 1998) (holding actions insufficient to support hostile environment claim
> where co-employees teased plaintiff, made sexual jokes aimed at her, asked her
> what "putting one rubber band on top and another on the bottom means,"
> commented about her low neck tops, repeated staring at her breasts with attempts
> to make eye contact, and four incidents of touching her arm, fingers or buttocks);
> *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997)
> (holding five "sexually-oriented, offensive" statements over sixteen months
> insufficient to show hostile environment, even though one of the harasser's

---

[14]This is especially true given the court's finding that the "Tulsa incident" was not based on gender, and therefore, not part of the court's consideration of the sexual harassment claims.

statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under Harris because not necessarily gender-related); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns;" suggesting land area be named as "Titsville" or "Twin Peaks;" asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?;" stating, "Just get the broad to sign it;" telling plaintiff she was "paid great money for a woman;" laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Kidwai v. McDonald's Corp.*, No. 93-1720, 1994 WL 136971 (4th Cir. 1994) (holding insufficient under Harris seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims--supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work--were not sufficient for actionable sexual harassment); *see also DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment.").

*Mendoza*, 195 F.3d at 1246-47.  The court went on to state the following:

In this appeal, the conduct alleged by Mendoza falls well short of the level of either severe or pervasive conduct sufficient to alter Mendoza's terms or conditions of employment.  Construing the evidence in the light most favorable to Mendoza, she presented evidence of four categories of harassing conduct: (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."

As an initial matter, whether Page's conduct testified to by Mendoza includes the necessary sexual or other gender-related connotations to be actionable sex discrimination is questionable....

*Id*. at 1247.

In *Gupta*, the complained-of conduct consisted of the following acts over a six to seven month period: (1) "look[ing her] up and down," (2) suggesting lunch at Hooters restaurant, (3) suggesting that she "change into casual attire before dinner," (4) accompanying her and another couple to "a place where single people meet," (5) offering assistance if she needed anything, (6) changing her office to one across from the alleged harasser when she complained her office was too small, (7) offering to drop food at her house, (8) calling her at home two or three times a week late at night and asking if she was in bed, (9) asking if she had a boyfriend, (10) asking her to lunch, (11) calling other faculty members "racist" and "evil," (11) putting a hand on her thigh in the office, (12) touching her bracelet and saying, "Oh, it is a very nice bracelet," (13) touching her ring, (14) touching and lifting the hem of her dress and commenting, "What kind of material is that?," (15) on a hot day when the air conditioning was broken, Gupta walked into the alleged harasser's office when he was expecting her and he had taken off his dress shirt and was wearing an undershirt and "he unbuckled his belt and pulled down his zipper

and start[ed] tucking his [dress] shirt in, (16) making comments that she was "looking very beautiful" and that "Indian people are really decent, and the Caribbean and Western people are really promiscuous" and stating that he could tell that she was "innocent and [ ] didn't have much experience," (17) after a storm, commenting that she should have called him since she was alone and he would have spent the night,[15] and (18) other looks that made her uncomfortable.  *Gupta*, 212 F.3d at 578-79.

After a jury rendered a verdict for Gupta, the Eleventh Circuit held that the evidence did not support a finding of harassment from an objective viewpoint.  Specifically, the court stated:

> Except for the phone calls to her home, none of Rhodd's conduct can be described as frequent.  Gupta testified that Rhodd phoned her often at 9:30 or 10:00 at night, and over the weekends, and sometimes asked her personal questions during these phone calls.  [ ]  While Gupta testified that these phone calls were frequent, she never contended that they were intimidating or threatening.  At no point during these phone calls did Rhodd ask Gupta for a date or make sexually explicit remarks or innuendos.  [ ]  Neither the content of Rhodd's remarks nor the number of the phone calls suggests obsessive or stalker-like behavior by Rhodd.  While frequently calling an employee at home and making even innocuous inquiries may be annoying or inappropriate behavior, it does not equal severe or pervasive sexual harassment--if it is sexually harassing conduct at all.  As for Rhodd's comments about the promiscuity of people from Jamaica as compared to the innocence of people from India, and the opinion he expressed of women, those statements were far from laudatory, but they were also isolated utterances over a period of several months.
>
> ...Gupta did not contend that Rhodd made any inappropriate gestures or comments toward her when he tucked in his shirt.  His conduct on this isolated occasion was not "physically threatening or humiliating." ...
>
> ...Gupta cannot establish her hostile environment claim with allegations that Rhodd stared at her twice, touched her ring and bracelet once, and kept asking

---

[15] Gupta understood this as a suggestion "that he wanted to [have a] sexual relationship with [her]."  *Gupta*, 212 F.3d at 579.

her to lunch.  Assuming it was sexual in nature, none of that conduct was severe, threatening, or humiliating.  As the Supreme Court has observed, in a normal office setting interaction between employees is to be expected....What one employee might perceive as conduct which crosses the proverbial line, another might perceive as banter.  We cannot mandate that "an employer [ ] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her."... Nor can we mandate that an employer be required to ensure that supervisors never touch employees on the hand or finger or ask them to lunch.

Of all the conduct about which Gupta complains, the most serious is Rhodd's placing his hand on her knee once, and his touching the hem of her dress once.  He should not have done either of those things.  But those were only two incidents in a period of six or seven months during which they were interacting (out of an even longer period during which the two worked for the University).  Each incident was only momentary, and neither was coupled with any verbal suggestions or advances....

...The standard does have an objective component, and applying it we conclude that the conduct and statements in question would not have interfered with a reasonable employee's performance of her job.

We are aware of our duty to examine and consider all of the behavior and conduct of a sexually or gender-related nature collectively in determining whether it meets the "sufficiently severe or pervasive" requirement.  We have done so, and it does not.  The alleged harassment in this case exemplifies "the ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2284, which the Supreme Court and this Court have held do not constitute actionable sexual harassment.  Gupta failed to present evidence that Rhodd's conduct was in any way "physically threatening or humiliating," or that a reasonable person would view the conduct as "severe."  *Mendoza*, 195 F.3d at 1246.  The Fifth Circuit recently opined, "All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."  *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (citations omitted).  This is not such a case.

Furthermore, a finding that Gupta's complaints constitute sexual harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would "trivialize true instances of sexual harassment."  *Mendoza*, 195 F.3d at 1252 n.10.  Based upon *Mendoza*, we hold that there was insufficient evidence presented at trial to support the jury's verdict finding the Board liable for hostile environment sexual harassment under Title

18

VII, and we reverse the judgment of the district court on that claim.

In a more recent case, *Johnson v. Booker T. Washington Broadcasting Service, Inc*., 234 F.3d 501 (11th Cir. 2000), the Eleventh Circuit reversed the granting of a motion for summary judgment.  The plaintiff claimed that she was sexually harassed when (1) Donnell repeatedly commented that Johnson had a sexy voice; (2) Donnell called out Johnson's name and winked at her; (3) Donnell called out Johnson's name and pulled his pants up in an obscene manner, revealing an imprint of his private parts; (4) Donnell called out Johnson's name and then looked her "up and down" while staring at her in a sexual manner; (5) Donnell said "Johnson, I like you and as long as I like you you're going to be all right.  You don't have to worry about your job;" (6) Donnell repeatedly attempted to massage Johnson's shoulders against her wishes; (7) Donnell stuck his tongue out at Johnson in an obscene manner; (8) Donnell inappropriately rubbed his body parts against Johnson; (9) Donnell asked Johnson why a person with a body like hers always covered it up; (10) Donnell commented that he could "pull [Johnson] up" anytime, a comment Johnson interpreted as a sexual reference; (11) Donnell got close to Johnson's face as if to kiss her; (12) Donnell commented that Johnson "really knocked him off his feet;" (13) Donnell stated that "he had to stay on his side of the room;" (14) Donnell commented inappropriately about sex to Johnson and questioned Johnson about her sex life; and (15) Donnell asked Johnson if she ever got lonely.  *Johnson*, 234 F.3d at 506.  The court stated:

> There is no doubt Johnson subjectively perceived Donnell's behavior as harassing.  Turning to the four objective factors: the conduct alleged by Johnson was not infrequent (Johnson points to roughly fifteen separate instances of harassment over the course of four months); the conduct was severe (Donnell's behavior included giving Johnson unwanted massages, standing so close to Johnson that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts); the conduct was physically threatening and

humiliating (same); and the conduct interfered with Johnson's job performance (she could not get along with her on-the-air co-host).  This set of facts differs from cases like *Mendoza* and *Gupta v. Florida Bd. of Regents*, where there were fewer instances of less objectionable conduct over longer periods of time.  *See Mendoza* 195 F.3d at 1242-43; *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 585 (11th Cir. 2000).  The facts of this case are more akin to the "continuous barrage of sexual harassment" in *Dees v. Johnson Controls World Servs., Inc.*, 168 F.3d 417, 418 (11th Cir. 1999).

*Id*. at 509.  In *Dees*, the conduct consisted of the following:

> sexually explicit stories and jokes, to comments about her body or those of male firefighters, to physical harassment.  On one particularly humiliating occasion, Jacobs asked Dees to sit on his lap.  When she refused, Jacobs picked her up and squeezed her so hard that she urinated in her pants.  Jacobs, laughing, then told the other firefighters what had happened.  On another occasion, Stewart ground his groin into Dees' buttocks after stating "look at that sexy mama, I could just eat you in that skirt."  Rainey propositioned Dees on a number of occasions, whispering in her ear that she was "the kind of woman I like; you're not only beautiful, you're hot-blooded," or telling her that she needed a "sugar daddy" and that with a body like hers, she would not have to work if she listened to him.  On numerous other instances, the four men grabbed or slapped Dees' buttocks, groped her leg, or otherwise touched her in a sexually suggestive manner.

*Dees*, 168 F.3d at 418-19.  The *Dees* court noted in *dicta* that "it is evident both that Dees subjectively found her work environment abusive, and that a reasonable person would find it so."

*Id*. at 422 n.12.

The conduct in the present case does not fit squarely within the parameters of any of the foregoing cases.[16]  The Tulsa incident in this case was far more physically threatening than the

---

[16]The plaintiffs liken their allegations to those set forth in *Reeves*.  The court, however, finds the cases distinguishable.  In *Reeves*, the plaintiff was the only female working on the sales floor with six male employees.  The sales floor was described as an open area with a "pod" of cubicles, such that the plaintiff was able to overhear her male co-workers both on the phone and in conversation with one another.  *Reeves*, 594 F.3d at 803.

Reeves' complained her coworkers "used curse words such as 'fuck,' 'fucker,' and 'asshole.' They used the intensely offensive epithet 'Jesus fucking Christ,' and the terms 'fucking asshole,' 'fucking jerk,' and 'fucking idiot.' They also discussed sexual topics such as masturbation and bestiality."  *Reeves*, 594 at 804.  Although the Eleventh Circuit noted that this behavior was "incessant, vulgar, and generally offensive," they also noted that it was not gender-specific.

Reeves, however, also identified a substantial corpus of gender-derogatory language addressed specifically to women as a group in the workplace. Her co-workers used such language to refer to or to insult

individual females with whom they spoke on the phone or who worked in a separate area of the branch. Although not speaking to Reeves specifically, Reeves said that her male co-workers referred to individuals in the workplace as "bitch," "fucking bitch," "fucking whore," "crack whore," and "cunt."

*Id*. Reeves testified that this conduct, among much more, occurred on a daily basis, and that she could point to every day of every year between summer of 2001 and spring of 2004 that at least some of this conduct occurred. Phrases like, "You fucking whore," were "commonplace." *Id*. Reeves also complained that a coworker had an "explicit image of a naked woman exposing her vagina on his computer screen," and that she was so offended and humiliated that her hands were shaking and she had to confront him. *Id*. at 805. Reeves complained of the offensive conduct with some consistency (her first complaint was three days after she was hired) over an almost three year period. *Id*.

In finding that the alleged conduct was sufficiently severe and pervasive to create a hostile work environment, the Eleventh Circuit reasoned:

> In a case like this, where both gender-specific and general, indiscriminate vulgarity allegedly pervaded the workplace, we reaffirm the bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII. Although gender-specific language that imposes a change in the terms or conditions of employment based on sex will violate Title VII, general vulgarity or references to sex that are indiscriminate in nature will not, standing alone, generally be actionable.... As we observed in *Baldwin v. Blue Cross/Blue Shield of Alabama*, "Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as sex." 480 F.3d at 1301-02.
>
> ...
>
> ...words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff.... It is enough to hear co-workers on a daily basis refer to female colleagues as "bitches," "whores" and "cunts," to understand that they view women negatively, and in a humiliating or degrading way. The harasser need not close the circle with reference to the plaintiff specifically: "and you are a 'bitch,' too." ... Similarly, words or conduct with sexual content that disparately expose members of one sex to disadvantageous terms or conditions of employment also may support a claim under Title VII....
>
> ...
>
> If the environment portrayed by Reeves at C.H. Robinson had just involved a generally vulgar workplace whose indiscriminate insults and sexually-laden conversation did not focus on the gender of the victim, we would face a very different case. However, a substantial portion of the words and conduct alleged in this case may reasonably be read as gender-specific, derogatory, and humiliating. This evidence, measured against the aforementioned principles, is sufficient to afford the inference that the offending conduct was based on the sex of the employee.
>
> A jury reasonably could find on this record that a meaningful portion of the allegedly offensive conduct in the office contributed to conditions that were humiliating and degrading to women on account of their gender, and therefore may have created a discriminatorily abusive working environment. The terms "whore," "bitch," and "cunt," the vulgar discussions of women's breasts, nipples, and buttocks, and the pornographic image of a woman in the office were each targeted at Reeves's gender. Like "bitch," "whore" is traditionally used to refer only to women.... A reasonable juror could find that this gender-derogatory language and conduct exposed Reeves to "disadvantageous terms or conditions of employment." ...
>
> The social context at C.H. Robinson detailed by Reeves allows for the inference to be drawn that the abuse did not amount to simple teasing, offhand comments, or isolated incidents, ... but rather constituted repeated and intentional discrimination directed at women as a group, if not at Reeves specifically. It is not fatal to her claim that Reeves's co-workers never directly called her a "bitch," a "fucking whore," or a "cunt." Reeves claims that the offensive conduct occurred "every single day," and that the manager "accepted and

incidents in *Mendoza*, but it was not gender-related.  Like *Mendoza,* many of the other

complained-of comments in the instant case were arguably not sexual or gender-related.

Additionally, *Mendoza* involved slight touching, while this case does not involve any touching at

all (with the exception of spittle, which was not gender-related).  Although there were numerous

instances in *Gupta*, many were not sexual or gender-related.  Each incident of touching in *Gupta*

"was only momentary, and neither was coupled with any verbal suggestions or advances."

*Gupta*, 212 F.3d at 585.  *Johnson*, involved much more significant and physical contact.  The

court described the conduct as "physically threatening and humiliating" and interfering with the

plaintiff's ability to work.  *Johnson*, 243 F.3d at 509.  While Baker's conduct in this case was

physically threatening during the incident in Tulsa, his conduct at that particular time was not

related to the plaintiffs' gender.  Instead, the evidence shows that the defendant was angry with

Wallace because he thought she was going to quit her job.  Nothing in the evidence suggests that

Baker's tirade against her was based on gender.  The incidences that were gender-related were

more akin to those set out by the Supreme Court in *Mendoza* than any of the others.  The entirety

of the plaintiffs' gender-specific complaints amounts to several incidences of sexually charged

jokes or comments over a period months, none of which were aimed at the plaintiffs directly.

Premised upon application of these authorities to the present facts, the court finds for the reasons

set out herein that the conduct the plaintiffs complain of was not "permeated with discriminatory

---

tolerated that same behavior" over her repeated complaints.  If C.H. Robinson tolerated this environment, it
may be found to have adopted "the offending conduct and its results," just as if the employer affirmatively
authorized it.

*Reeves*, 594 F.3d at 809-812.  The court afforded great weight to Reeves' assertion that the conduct occurred every single day,
and that she complained consistently with no results.  The same is not true in the instant case.  Instead, the plaintiffs complain of
six specific instances of conduct that is clearly gender specific.  Based upon the case law as set out herein, the court simply does
not find those complaints sufficient to establish a hostile work environment claim.

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale*, 523 U.S. at 78.

Of the conduct the plaintiffs complain about, the only gender-specific conduct was: (1) Baker calling Wallace a "stupid bitch;" (2) Baker's jokes in Tulsa about Sanford's "dick," and a woman's "pussy;" (3) Baker's reference to the female sales representatives as his "hoes;" (4) Baker's comment about a stylist's "nice ass;" (5) Baker's comment to Honey's customer about "looking sexy tonight with those ta-tas hanging out;" (6) Baker's comment to Honey's customer about seeing and feeling her "fake boobs" if she were to ever get any; and (7) Baker's use of the word "bitch" an unspecified number of times.[17]  These alleged incidents, although offensive, simply do not rise to the level as enunciated by the Eleventh Circuit and the Supreme Court for severe and pervasive conduct.   A plaintiff alleging sexual harassment "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* ... because of ... sex.'" *Oncale*, 523 U.S. at 80.  The plaintiffs have failed to meet that burden in this case.  Therefore, summary judgment is due to be entered on the plaintiffs' sexual harassment claims.

### Negligent and/or Wanton and Malicious Training, Supervision, and Retention

The plaintiffs next allege that the defendants negligently failed to train, supervise, and discipline Baker after they had knowledge of his active harassment on an ongoing basis of the plaintiffs.  (Honey Amended Complaint at ¶¶ 33-39; Wallace Amended Complaint at ¶¶ 38-44).

The defendants assert that this claim is due to be dismissed on summary judgment

---

[17]Although the plaintiffs allege that Baker used profanities "frequently," they have not specifically alleged that he used gender-specific profanities frequently.  As the court has already noted, frequent use of generally offensive words that are not gender-specific is not enough to establish a hostile work environment based on sex discrimination.

because (1) as the owner of Baker Beauty, Baker cannot be held liable for negligently and/or

wantonly hiring himself, and (2) the plaintiff cannot show that Baker was acting in the line and

scope of his employment [during the Tulsa incident].  (Doc. 23 at 27-28; Doc. 25 at 27-28).

The court in *Kelley v. Worley*, 29 F. Supp. 2d 1304, 1313 (M.D. Ala. 1998), stated as

follows concerning negligent hiring, retention, and supervision claims:

> The Alabama Supreme Court has stated that in the context of a master and servant relationship, such as that between the corporate Defendants and [the employee], "the master is held responsible for the servant's incompetency when notice or knowledge, either actual or presumed, of the incompetency has been brought to the master."  *See Mardis v. Robbins Tire & Rubber Co.,* 669 So. 2d 885, 889 (Ala. 1995).  For the master to be held liable for the servant's incompetency, it must be affirmatively shown that had the master exercised due and proper diligence, the master would have learned of the incompetency.  *Id*. This may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them.  *Id*.

The court agrees with the defendants that Baker cannot be held liable for negligently or wantonly

hiring or training himself.  Although the plaintiffs assert that Ms. Baker was aware that Baker

could be a "mean drunk," no evidence suggests that she was aware of his allegedly sexually

discriminatory conduct, or that she had any "master relationship" over him.  As such, summary

judgment is due to be entered on this claim.

### Intentional Infliction of Emotional Distress

Finally, the plaintiffs advance claims of intentional infliction of emotional distress against

the defendants.  They state that the defendants' conduct was "extreme, outrageous and beyond

the boundaries of decency." (Honey Complaint at ¶ 41; Wallace Complaint at ¶ 46).  The

defendants assert that the plaintiffs have not pled allegations sufficient to support a claim for

outrage or intentional infliction of emotional distress.  (Doc. 23 at 31, Doc. 25 at 31).

The Alabama Supreme Court has stated:

The tort of outrage was first recognized by this Court in *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).  In that case Inmon, who had formerly been employed as a claims supervisor by American Road Service Company, sued his former employer, alleging that he had been mistreated during the events leading to his termination and that that mistreatment had constituted outrageous conduct; he argued that outrageous conduct should be recognized as a tort.  In *Inmon*, this Court recognized such a tort.  It discussed the requirements of the tort, emphasizing the extreme nature of the defendant's conduct that would be sufficient to constitute the tort, and the severity of the emotional distress that would entitle a person to recover for that tort:

> "The emotional distress [caused by the defendant's conduct] must be so severe that no reasonable person could be expected to endure it.  Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme.  Comment, Restatement [(Second) of Torts], at 78.  By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. [Cmt. d], Restatement, supra at 72."

The tort of outrage is an extremely limited cause of action.  It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context, *Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987); (2) barbaric methods employed to coerce an insurance settlement, *National Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983); and (3) egregious sexual harassment, *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989).  *See also* Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law, § 23.0 (2d ed. 1996).  In order to recover, a plaintiff must demonstrate that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it."  *Green Tree Acceptance, Inc. v. Standridge*, 565 So. 2d 38, 44 (Ala. 1990) (citing *American Road Service Co. v. Inmon* ).

*Potts v. Hayes*, 771 So. 2d 462, 465 (Ala. 2000).  Because the court has already found that the

defendants are due summary judgment on the plaintiffs' sexual harassment claims, the

defendants are likewise due summary judgment on the plaintiffs' intentional infliction of

emotional distress claims as well, as the defendants' conduct does not fit into any of the other recognized kinds of conduct that warrant an outrage claim.

### Plaintiffs' Remaining State Law Claims

As noted herein, the defendants did not move for summary judgment on the plaintiffs' state law claims of assault and batter.  Although the court may decline to exercise supplemental jurisdiction of these claims where "the district court has dismissed all claims over which it has original jurisdiction, s*ee* 28 U.S.C. § 1367(c)(4), the court may also maintain jurisdiction where doing so would maintain the balance of judicial economy, convenience, fairness, and comity. *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988).

Here, by the Order entered contemporaneously herewith, the court has entered final summary judgment on all federal claims over which it had original jurisdiction.  However, procedurally, all that is left for the court to do is to conduct a trial as to the plaintiffs' assault and battery claims.  Those claims are not so novel or complex as to weigh against trial in federal court.  Additionally the court is already intimately familiar with the record and the parties' positions, and stands ready to conduct a jury trial on the remaining claims expeditiously. Therefore, the court finds that the interests of justice, judicial economy, convenience, fairness, and comity are best served by this court's exercise of supplemental jurisdiction over the plaintiffs' assault and battery claims.  Accordingly, a final pretrial conference will be scheduled by separate order.

### CONCLUSION

Premised on the foregoing, the court finds that the defendants' motions for summary judgment are due to be granted on Counts I, II, and III of the plaintiffs' complaint.  An order to

that effect will be entered contemporaneously herewith.

     **DONE and ENTERED**, this the 5th day of October, 2010.


                                                              _____
                                                              **JOHN E. OTT**
                                                              United States Magistrate Judge